Wildlife Preserve v. Romero, case number 24-776. Good morning, and may it please the Court. I'm Katherine Pistorikos-Kelly. I'm appearing on behalf of the Plaintiff Appellant Wildlife Preserves, Inc. I represented plaintiff in the district court in this matter. The district court granted defendant summary judgment motion on the grounds that plaintiff violated the statute of limitations because plaintiff knew or should have known in 1988 of a fence that was constructed in 1967 which violated the deed restrictions. This court should reverse. Before I get into the legal issues, I wanted to provide the Court with a 30,000-foot view of the case. This case isn't just about deer. It's about a party fulfilling their obligations in a deed. There is no purpose to deed restrictions if one party doesn't comply with them and if the courts don't enforce them. If defendants didn't want to comply with the deed restrictions, they shouldn't have accepted the land. My client is a land conservation group that manages preserves in New York and New Jersey. So can you let me know what you think the best case you have for whether or not the 1967 fence and how they claim you should have known isn't sufficient to put you on notice? Well, to put us on notice, Your Honor? Yep. So there is – the issue about the notice is that it didn't provide us reasonable awareness and it wasn't adverse. Right, and I'm asking for the case that you think best exemplifies that. Yes, Your Honor. I think Kane County, Utah versus the U.S. It's a Tenth Circuit case. It's 772 F. 3rd 1218. Is there anything precedential in our circuit? No, Your Honor. Isn't it just an interpretive question of the deed? I mean, that is to say to put you on notice of a violation, it would presumably have to be a violation, right? Yes, Your Honor. And so isn't the question – I suppose one question is whether or not the surrounding fence in the 60s is a violation of the terms of this somewhat inartfully written deed? Correct, Your Honor. And how do you think about that question? Well, Your Honor, there was not enough – there wasn't enough information in 1988 to put us on notice, and I can explain why. So that's a little bit of a different approach.  Do you agree that what we're asking were you on notice of is a violation or a breach of the deed? So you're asking if that 1960s fence was a violation? Right. Your Honor, it seems as if it was because it was a barbed wire – it was a 6-foot-tall chain-link fence that was in the deeded lands. We weren't on notice, as I've said before. So tell me your interpretation of the deed language as to why that fence violated the deed. The deed requires that the land – the deeded lands be maintained in their natural state as a sanctuary that doesn't adversely affect flora or fauna. So what that means is that the defendants can't prefer one species over another. So – and that's one fundamental issue here is that the defendants have claimed throughout this case that their requirement is to maintain the status quo. So if deer are eating holly, they have to stop the deer from eating holly. But that's not what's written in this deed. The deed says that the land has to be maintained in its natural state. And so you read that literally? Yes, Your Honor. So let me ask. I don't know if there are rivers that run through the sunken forest land, but – I don't believe so. Let's assume there's a river or something like that and a giant tree falls and dams the river and that causes or will cause flooding that's going to kill the holly left on its own. Would you understand the removal by the government of the tree to be a violation of the deed? Your Honor, I wouldn't because I wouldn't see that as harming flora or fauna. But I do, on the other hand, this action – Well, let's say you have to go in and you need a big truck and things, you know, there's – things will get harmed in the course of removing that tree. I mean, in Your Honor's hypothetical, I would say that wouldn't. So it depends kind of how, you know, what the literal – how we interpret this language, right, if it's a violation and, therefore, if you're on notice of a violation. Right, but this isn't – this situation isn't a natural occurrence. This is a plan that its purpose is to kill deer. Well, a truck coming in and removing a tree isn't a natural occurrence. Well, but I'm sure there are ways, Your Honor, to remove that tree without negatively affecting fauna. I mean, we could – you know, there are ways that somebody – people have removed trees from my property and they don't come in with giant trucks. So there's people that can come in with chainsaws and move it. And so there's ways to minimize the effects in Your Honor's hypothetical. Can I ask – has this begun happening yet? Yes. Like, what steps has the Park Service taken to implement the plan? Sure. You've referred to the record of decision, but I'm not sure that is enough to trigger the reverter. Sure, Your Honor. Well, there is case law that indicates that the record of decision does trigger the reverter, but they actually have taken steps. They've conducted hunts on the deeded lands for, I believe, the past three years. They have – my understanding is that they have not begun the construction of a fence. My understanding is because they haven't received funding for it, but they have, as I said, killed deer on the land. I thought the hunts were part of – that had been a long-going project to assess the situation. No, Your Honor. That's pursuant to the plan? Yes, Your Honor. The hunt in the sunken forest in these deeded, restricted lands began in 2017. Okay. So in your view, the first hunt is what injured the flora fauna or affected the flora fauna? I'm sorry, Your Honor? In your view, the first time there was a hunt and a deer was killed, that is what triggered the – that's what affected the flora or fauna triggering the reverter? Yes, Your Honor. Well, our view is that in 2016 when the plan passed, that's what triggered the reverter, and then the plan was enacted the first time. But the passage of the plan doesn't affect the flora or fauna, does it? There's case law that indicates that that does trigger the reverter, but that's neither here nor there, Your Honor, because they actually have killed deer in the deed-restricted lands starting in 2017. That was – that's our understanding of the first time they've done it. Because as the court knows, in 1988 they also planned another hunt in the entire Fire Island National Seashore, including the deed-restricted lands. We filed a lawsuit with other plaintiffs to stop this hunt in the deed-restricted lands, among other things, and the defendants reversed course regarding the hunt on the deed-restricted lands in 1988. So they continued the hunt on all other lands on Fire Island, but they stopped the hunt on those deed-restricted lands in 1988. So I'm not seeing a lot of cases about the way the Quiet Titles Act of the 12-year statute of limitations applies to automatic reversion. So can you tell me about what you think is the most appropriate source of guidance? Is it New York law? Is it common law generally? Is it other Quiet Title Act cases? Yes, Your Honor, and we think that – we couldn't find any other cases as well, Your Honor, similarly. So that's why we were encouraging the court to liken this to like the separate accrual cases that this court has held in RICO and that the U.S. Supreme Court has done for employment discrimination actions. But I'm not sure how that works when title can only revert once, right? So like the accrual – they don't – well, explain to me how you think that they fit well together. Sure. I mean in those – obviously Your Honor knows that in those cases each separate instance is a separate accrual. In this case where the government is the landowner, they have the option to give back the land or to keep the land and pay for the just compensation for the issue having occurred. So in Your Honor's situation, I understand with a private landowner the reverter automatically entitles the grantor to keep the land. But that's not exactly how it works here. So that's why we think that a separate accrual works and makes sense. You know, in this situation, the 1967 fence was approximately 50 years after the 2016 plan. So they're two totally separate issues. And we would encourage the court to adopt this separate accrual. We understand that it's an issue of first impression for any circuit court. And my understanding is the only court to have ruled on this issue is the district court. And we believe that they ruled incorrectly. Thank you, counsel. You've reserved a couple minutes for rebuttal. Thank you. We'll hear from the government. May it please the court, good morning. I am James Knapp. I'm an assistant United States attorney in the Eastern District of New York. I represent the National Park Service, Fire Island National Seashore Superintendent, Alexi Romero, and the United States of America. This court should affirm the lower court's grant of summary judgment entered in favor of the United States and the lower court's denial of summary judgment to Wildlife Preserves because Wildlife Preserves' claim brought under the Quiet Title Act in 2017 was untimely. Before I get too far into my prepared remarks, I want to make sure the record is clear. There has been no deer hunting in the Sunken Forest. Yeah, I wanted to ask about that. Just my question was, has the plan been implemented yet? And if so, what's been done? Your friend said that there was a hundred percent. So the plan has been implemented on the greater areas of Fire Island National Seashore. The Sunken Forest is a discrete, several-acre section of the Sunken Forest. There has been culling, and the record will show the lower court, Wildlife Preserves in 2019 brought an order to show cause seeking temporary restraining order to halt a cull at the William Floyd Estate, which is a discrete section of Fire Island Seashore. And so since implementation of the plan and this court's decision in Friends of Animals— Was that culling? Yes, it was culling. There has been no— So that was implementation of the plan? It was. And that, I assume, affected flora and fauna? Not in the Sunken Forest. You're saying that was outside of the Sunken Forest. Outside of the Sunken Forest. The Park Service hired sharpshooters to come in. What about the bisecting fence? Well, so that's interesting, Your Honor. The Park Service maintains that neither the plan, nor the 1967 fence, or any action that's taken in managing the Sunken Forest has violated the deed restrictions in any way. No, I understand that, but the fence has been— No, the fence hasn't been constructed either. Has been constructed. No action has been undertaken in the Sunken Forest during the course of this litigation. What I'm trying to understand is if there's been nothing that affects the flora or fauna, then the reverter has not yet been triggered, and so there is no quiet title action. Well, Your Honor, under plaintiff's theory, certainly if the prospect of offense would violate the Quiet Title Act, then certainly the actual construction of the fence should violate the Quiet Title Act. Notice of which wildlife preserves received in— Well, the reverter— The reverter has to be triggered first, right? Correct. And so the question is whether planning of the fence would affect the flora or fauna. Isn't that the language that would trigger the reverter interest? Well, according to wildlife preserves, the entire plan triggers the reverter, but— Right, and that doesn't seem right to me, I guess, is I'm trying to understand how far the plan has gotten. The plan has—nothing has been done on the Sunken Forest. So to the extent the reverter is triggered and plaintiff brought this action, we submit that it's the 1967 fence, about which plaintiff learned in 1988, and they took no action to enforce their rights. Do you understand that fence in the 60s to have been a violation of the deed, a breach of the deed? From the government's perspective, it wasn't. So if they're right and it was, there was a reverter in the 60s. The reverter would have been triggered, and as Your Honor suggested, it's difficult to conceive how title would volley back and forth. I mean, title would revert once upon the initial violation of the deed restriction. That occurred as a result of the 1967 fence, which wildlife preserves learned about. So it may be that there's just alternate positions here, but I'm— If you could explain to me how you can at the same time argue that the fence didn't violate the deed, but the sporadic fence put them on notice that there was a violation of the deed, and therefore they've sat too long. Well, let me see if—I'm not sure I'm understanding Your Honor's question. There was fencing remaining in 1988. The part of the 67 fence remained in 1988. Right, but you are saying that's not a violation. If it is not a violation, then how were they put on the notice such that they've lapsed their time? Well, they were put on notice because the Park Service did intend to conduct a research hunt, which under the terms of the deed— But didn't happen. No, no, no. Your position, at least as I read the brief, was that the sporadic fencing put them on notice. Because it remained in existence, yes.  If it didn't violate the deed, how did it put them—what did it put them on notice of? Well, again, adopting wildlife preserves theory that the flunk and forest had to be maintained in its natural state, the existence of the fence would be contrary, so would a boardwalk. Okay, if we decide then that the deed didn't violate the fence—I'm sorry, the fence didn't violate the deed, then were they appropriately put on notice? Well, they were put on notice. It's any action that the government takes, not the merits of the action. So the hunt as well, the notice of the hunt, research hunt, that initially was supposed to— Why is that? What you just said, why is that the case? So you have to be put on notice of something, of a potential claim? Other circuit courts have held, yes, that it's not the conclusive conduct that is undertaken that could trigger— But why? Under quiet title language? In particular, what? How do we get to there as a matter of interpretive law? Well, any action or notice of action that would be contrary to the donor's interest in the land would trigger the, in this case, the reverter, and put the party on notice that they're— But they sued and stopped you. So if they were, if as you're saying that the hunt noticed something, they acted on that promptly and you all stopped. So that is why I understood your briefs to say that it was the reference to the sporadic fencing that put them on notice for where we are today. And I was very surprised to hear the colleague, your colleague on the other side, saying that they thought the deed, that the fence might violate the deed. But I want to hammer down this position that you seem to be taking, that the hunt that they stopped put them on notice for what? You didn't proceed. Well, it's the fence, the hunt, it's the prospect of taking action that is contrary to the donor's interest, wildlife preserve's interest. Any prospect? Any— Even if you don't do it? That's what wildlife preserve's theory of the case is. No, no, no. And that's what the law is on. What is the government's position about what put them on notice? First you were saying in your briefs the fence, and now you're saying it was the hunt that failed. What put them on notice that they needed to do something that triggered the revert? In this case, it's the fence. They learned unequivocally that the fence was there. Okay, but how can that be if you are saying the fence does not violate the deed? It's not—we could go back and forth about whether or not the parties, I'm saying, not the court. The parties can go back and forth, and in this case, wildlife preserves and the Park Service did go back and forth, that the planned action in 2016 violates the deed, and the Park Service interpretation was no, it doesn't. We are trying to manage this land. The same argument applies to the 67th fence. It's an interpretation. One logical way, I think, out of what otherwise feels like a puzzle to me is to set the statute of limitations question aside and start with the question of whether the 2016 plan violates the deed. And you have an interpretation, I think, of the deed that it doesn't, right? It does not. And you raise case law, which says as an interpretive matter, we're to interpret any ambiguity in your favor. Well, the Eighth Circuit has a more considerable— We have. I mean, we have a case called Witter—I'm sorry, not us, the New York Court of Appeals, which says that covenants restricting use are strictly construed against those seeking to enforce them. There's a case called Kemp where language used in a restricted covenant is equally capable of two interpretations. The interpretations which limit the restrictions must be adopted. You've cited these cases. And so if we're applying that interpretive principle and asking whether the 2016 plan violates the deed, this is your alternative argument for affirmance, right? Correct. But if we were to adopt that, then we don't even need to ask the question as to the statute of limitations, would we? I would agree with Your Honor that if the deed itself is quite vague, and if the court were to affirm based on the vagueness of the deed and that the least restrictive interpretation— Not that it's vague and therefore can't be enforced in any way, but that there's ambiguity. You're arguing, as I understand it, for an interpretation which is you understand your obligations to maintain the preserve and operate it sort of writ large for the preservation of flora and fauna, right? Correct. And so an individual destruction of flora and fauna doesn't answer the question of whether it's a violation because you see it as sort of the whole project. The Park Service is managing the land, the sunken forest, and greater Fire Island in accordance with the enabling legislation. Well, the enabling legislation is different than the deed. It is. So do you interpret your obligations as to the sunken forest as controlled by the deed or by the enabling legislation? Well, the Park Service is operated under the trying to work very carefully to adhere to both. Right. The enabling legislation has a specific provision that addresses the sunken forest and that it's supposed to be preserved in its state from when the Park Service received the land in 1964. That's the statutory mandate. And then on top of it, the deed restriction carries with it the limitations set forth in the deed. So your position would be consistent, as I understand it, if you said the 2016 plan doesn't violate the deed because of making use of this interpretive principle and staying consistent with the language of the deed. It also wasn't violated in the 60s consistent with that same principle. So there's just not a statute of limitations issue, but there's a primary question about interpreting the 2016 deed. I'm sorry, interpreting the deed as with respect to the 2016 plan. And if there's not a violation, that's the end, right? You're affirmed on alternative grounds. Yes, Your Honor. I mean, plaintiff is here saying there was a violation. We submit there was not. But you say there's not, which runs into this problem with the. But if there was, then you need to look back in time when the exact same conduct occurred to trigger the statute. But I agree with Your Honor as well that there are other grounds in the record, considerable other grounds in the record to affirm the lower court's decision. Is it a question of who decides whether or not? I mean, I'm assuming. OK, so we have undisturbed by hunting, trapping, fishing or any other activities that might adversely affect the environment or the animal population. The district court decided on the basis of a statute of limitation issue. Are we in a position to decide whether or not the plan violates the deed or is that a fact question? I submit based on the comprehensive record before the court, as well as this court's prior decision of Friends of Animals, that the deed is the plan does comport with environmental law. The deed restrictions and the Park Service is enabling legislation. The Park Service is charged with preserving. That's not my question. My question is, does the district court need to decide if there is a question of fact as to whether or not you comply with the parts of the deed, specifically the adversely impacting? No, Your Honor. I think this court is equipped with the record before it to make that. But it hasn't happened yet. Well, there are a number of grounds on which this court could affirm it. I see my time has expired. Should I continue? If you've answered the question. Fine. Thank you, counsel. We'll hear rebuttal. Thank you. Your Honor raised the issue of whether the 2016 plan, just the fact that it got enacted, triggers the reverter. And it does, Your Honor. It's not something that was briefed in the papers. Well, first, can you clear up the factual question about whether you had talked about a deer hunt in 2017, and I think the government said that that was not on the land that we're talking about. Your Honor, that's the first I'm hearing of it. We filed a temporary restraining order to stop the hunt on the deeded lands. We lost that TRO. I assume this is something we can figure out. Yes, Your Honor. And actually – There was a hunt in the second year. Yeah. And, I mean, based on media reports, there was a hunt on the deeded lands. And our understanding is that it occurred over multiple years. We don't care about the William Floyd estate. We're not suing about any other land on the Fire Island National Seashore. They can do whatever they want. They can kill deer. They can whatever they want to do, erect fences anywhere else. That's not our issue. Our issue is those less than 40 acres in the sunken forest, which our position is it needs to be maintained as a sanctuary for flora and fauna in its natural state. And our understanding was that there was a hunt based on media reports. But nevertheless, Your Honor, I can provide Your Honor with the case law. It wasn't an issue on appeal, so we didn't cite this law. But that says that just the enactment of the record of decision does trigger the reverter. Our understanding was that their entire argument was the statute of limitations. No, the final argument in their brief is an argument for affirming on alternative grounds that there's not, that the 2016 plan doesn't violate the deeds. Right? Yeah, that's their alternative argument, yes. That's not about the statute of limitations. Their argument as for that issue is that the word environment is vague and ambiguous, which it's not. It's capable of a definite meaning. It's defined. The deed goes into further detail about what is expected. And, you know, there's case law that we cite in our brief. They make other arguments about the language, the meaning of hunting and trapping and whether this constitutes it. But, I mean, I understand at base you're – well, I guess let me ask you. They rely on these cases that include this, what I understand to be a New York interpretive principle regarding restrictive covenants. Do you think that's applicable here? What do you mean, Your Honor? I'm sorry. So the Witter case, which is a New York court appeals case, that covenants restricting use are strictly construed against those seeking to enforce them. They cited Kemp, which is an appellate division case where the language used in a restricted covenant is equally capable of two interpretations. The interpretation which limits the restriction must be adopted. Is that an applicable principle here for their alternative argument? I'm sorry. I don't understand the principle. So the idea is that we want – the principle is we want title settled. And so if there's a restricted covenant, we construe it against the party that granted the land pursuant to the restricted covenant. That – I mean, that is the principle in New York State, yes. But the issue – Applicable here to the interpretation of the deed, right? Well, Your Honor, I mean, only if it's vague or ambiguous. And we don't think it is. And even if it is, there is a mechanism under the law for how the court deals with that. And we cited those cases. For example, they have – you know, the court has to – has to assume or has to figure out what these words mean. Do they have a definite meaning? Is it subjective? The covenant just doesn't get eliminated because the court determines that the words are vague. You know, you and I had a colloquy in the beginning about – my hypothetical. You said it has to be maintained in the natural habitat. And they're – my sort of big-picture understanding of their interpretation is that they have to maintain and operate it for the purposes listed in the covenant sort of big-picture-wise. And so you have deer population coming in as a result of access to human garbage and the like. It's coming in and growing exponentially and could kill off the flora – the holly. And so to protect the holly, they've come up with the plan. And they see that, as I understand it. Is that a permissible understanding of the covenant's maintenance and operation obligations? No, Your Honor, because that concept is that they need to keep the status quo on those less than 40 acres. And that's not – I think what you're – is it because hunting and trapping are not vague, right? Like the vague part is the – it's natural habitat, undisturbed part or maybe any other activities that might adversely affect the environment. Well, I don't think anything is vague. But hunting and trapping is specific. Of course. Yeah, and so is the language that says that they can't do anything to adversely affect flora or fauna. I mean, this concept that culling doesn't adversely affect an animal is silly. You're killing an animal. Not to beat a dead horse, but it – just to go back to the original hypo, you sort of said, well, if you – you know, you have to minimize damage if you're coming in to remove the tree. You could imagine that that language could be understood to say your goals have to be for the purposes listed. That is, you have to maintain it in its natural state, operate it as a reserve for the purpose of the maintenance of wildlife and its natural habitat and scientific and educational purposes incidental to such maintenance. You could – I mean, I think you've conceded at some level there's some play in the joints as to how to do that. Sure, Your Honor. But, I mean, removing a tree, let's say with a hand tool like a chainsaw, is different than killing hundreds of deer purposefully just to – just for the act of killing them. Why can't they kill the deer everywhere else on Fire Island? They go into their brief about how they've tracked them and they see how they move, you know, over the entire 19,000 acres. Why is it so important that they kill deer or erect a fence in this small area in the Fire Island? Maybe I understood – I understood that they're trying to get the deer out of the area through baiting and the like to get it to a zero population. I mean, their asserted purpose is for preservation of the flora. And only if some remain will they engage not in sport hunting or permit the public to engage in hunting of some kind, but they'll kill any remaining deer. Right. So they'll keep the population at zero within the fence, which is undoubtedly violates the deed restriction. I mean, if you're keeping an area as a sanctuary, if that's your obligation to keep an area as a sanctuary for animals and plants, it can't be a sanctuary if whatever animal is found within that fence is killed. So is it – there's no – you don't understand any sort of growth in population of the deer population or some other tree disease or something that could happen that would destroy the holly, which I understand is what's so particularly unique about – Do I think – do I think there's something else that could be killing? Under this deed to come in and try to prevent that destruction in an ecosystem, which inevitably one thing affects the other. So an overpopulation of deer to some point, that would surely kill the holly in its entirely. Would they have an obligation under the deed to do something? No. Even though the deer is brought there by the human population outside the sunken farm? Yes. Yes. If there's no other questions, thank you very much. Thank you, counsel. Thank you both. We'll take the case under advisement.